UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOTIVATE INTERNATIONAL INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EDWARD INLOW and PBSC URBAN ) <br> SOLUTIONS INC., ) <br> ) <br> Defendants. ) <br> ) | CIVIL ACTION NO. _____ <br><br> JURY TRIAL DEMANDED |

## **VERIFIED COMPLAINT**

Plaintiff Motivate International Inc. ("Plaintiff," "Motivate" or "the Company"), by counsel, and in support of this action for injunctive relief and damages against Defendants Edward Inlow and PBSC Urban Solutions Inc. (collectively, the "Defendants") for claims resulting from the violations of their statutory and common law duties, alleges and states the following:

### **The Parties**

1. Motivate International Inc., formerly known as Alta Bicycle Share, Inc., is a Delaware corporation with its principal place of business located at 5202 3rd Avenue, Brooklyn, New York 11220.

2. Defendant Edward Inlow ("Inlow" or "Defendant") is an Illinois resident who resides at 845 N. State Street, Unit 1311, Chicago, Illinois 60610. He was first employed by Motivate as General Manager for the Company's Chicago Bike Share Program (the Divvy system), and was subsequently promoted to Chief Operating Officer ("COO") and then Vice President of Operations. He resigned from Motivate and his last day as an employee of the Company was in early September 2015. He is currently the Chief Executive Officer ("CEO") of

Shift Transit LLC ("Shift Transit"), a company he formed in partnership with Defendant PBSC Urban Solutions Inc. ("PBSC"). Shift Transit is a competitor of Motivate.

3. Defendant PBSC Urban Solutions Inc. is a Canadian corporation with its principal place of business located at 1120 Marie-Victorin Blvd., Longueuil (QC) J4G 2H9, Canada.[1] PBSC regularly transacts business in the United States, including in Aspen, Boston, Chattanooga, Chicago, Columbus, Minneapolis, New York City, and Washington, DC.

4. PBSC has served as a vendor for Motivate, but, upon information and belief, as well as its own press releases, is now a competitor of Motivate. On October 9, 2015, Inlow and PBSC announced that they were joining forces to launch Shift Transit, which will compete with Motivate.

## Jurisdiction and Venue

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## Statement of Facts

A. Motivate's Business and Defendant's Employment with Motivate

7. Motivate operates bike sharing systems across the United States, as well as in Canada and Australia. Committed to creating sustainable and enjoyable environments, Motivate's bike share systems change urban landscapes and offer a flexible way for commuters to complete short trips. The Company adopts a comprehensive approach to planning and operating bike share systems, and provides solutions for all aspects of bike share, from location assessment and business modeling to system maintenance and expansion.

---

[1] PBSC is registered in Quebec, Canada as PBSC Solutions Urbaines Inc.

8.  Inlow was hired by Alta Bicycle Share, Inc. ("Alta") in March 2013. In January 2015, Alta was renamed Motivate International Inc.[2]

9.  Inlow was initially employed as the General Manager for the Company's Chicago Bike Share Program (the Divvy system). As General Manager, Inlow reported directly to Motivate's Chief Management Officer. He was responsible for leading all aspects of the Company's new Divvy system, including marketing, finance, operations, and customer service. For example, he worked to coordinate all aspects of the launch activities for that system, including budget, finance, human resources, subcontracting, site planning for several hundred on-street station locations, and multi-faceted marketing and media efforts. Following the launch, Inlow oversaw all aspects of ongoing system operations, including managing revenue and expense forecasting, finance, human resources, and subcontracting; running operations; executing a marketing plan to maximize membership, revenues, and media acceptance; coordinating among multiple city agencies, sponsors, and other stakeholders; developing and executing operational, marketing, and customer service best practices; and ensuring that contractual obligations and reporting metrics were satisfied. Inlow's job duties as General Manager of the Chicago Bike Share Program required he have access to, and he in fact had access to, Motivate's most confidential information and trade secrets.

10. In February 2014, Inlow was promoted to COO of Motivate, an officer position and the second highest ranking position at the Company. In November 2014, Inlow's title changed to Vice President of Operations, but his duties did not change; he remained an officer and the second highest ranking employee at the Company, reporting directly to Motivate's new CEO Jay Walder. As COO/Vice President of Operations, Inlow oversaw all operational aspects of the Company's eleven bike share systems (including marketing, finance, human resources, procurement, client relations, and technology). Among other things, he managed profit and loss for the various systems, negotiated contracts (including supplier contracts and business

---

[2] Throughout this Complaint, Alta and Motivate are collectively referred to as "Motivate" or the "Company."

expansion agreements), and developed operating plans. He also oversaw all aspects of Motivate's equipment vendor relationships and supply chain, managing relationships and negotiating, and implementing master agreements. In addition, as COO/Vice President of Operations, Inlow served as a key contributor to all business development activities and strategic planning, including working on new bids, working with current clients to develop and implement expansion plans, pricing, and technology changes, reviewing potential acquisitions, and evaluating new technologies for implementation.

11. Inlow's job duties as COO/Vice President of Operations required him to, and he in fact had access to, highly sensitive and proprietary information at the Company's highest levels, including for example, confidential information and trade secrets regarding the Company's business practices and processes and its future strategic plans, as well as its financial models and forecasts, intellectual property, strategic initiatives, human capital, contracts and pricing information, and customer lists.

B. Defendant's Confidentiality Obligations and Acknowledgments

12. Inlow was well aware of Motivate's need and efforts to maintain the secrecy of its confidential information and trade secrets. The importance of maintaining confidentiality is set forth in and on Company documents and has been reiterated by Motivate's leadership.

13. For example, Motivate's Employee Handbook notifies all employees that they may not disclose confidential information without authorization, and reiterates that employees have the duty and responsibility to safeguard all confidential information. Inlow was well aware of the Company's handbook provisions. A copy of the relevant section of the Employee Handbook and Inlow's acknowledgment is attached hereto as Exhibit A.

14. Inlow also confirmed his confidentiality obligations in his October 29, 2013 offer letter, Inlow acknowledged that (1) he was required to protect all confidential information (including trade secrets) from disclosure to any third party; (2) all confidential information was the Company's exclusive property and could only be used for the Company's exclusive benefit; and (3) at the end of his employment, he was required to promptly return, or destroy under the

supervision of the Company, all confidential information in his possession or under his control. A copy of the October 2013 offer letter is attached hereto as Exhibit B.

C.     Inlow's Resignation from Motivate

15.     In or about early August 2015, Inlow approached Motivate Vice President of Human Resources John Reynolds ("Reynolds") and explained that he was considering leaving the Company for a number of personal reasons. In a series of conversations during August, Inlow claimed that he was burned out and was "leaving bike share" to look for a new field of work. Reynolds and Inlow had multiple conversations about Inlow's potential resignation, and Reynolds proposed a variety of alternatives to resignation including Inlow (1) taking a few months off over the winter; (2) taking off the month of September; or (3) working remotely in Chicago, where he was considering relocation.

16.     On August 13, 2015, Inlow sent Motivate President and CEO Jay Walder his letter of resignation over e-mail. In this message he reiterated many of the claims made to Reynolds, citing personal stressors such as the fact that his fiancé was unhappy living in New York, and that his father in Chicago was getting older. Inlow also represented that he needed time off for personal reasons and to "recharge." Specifically, Inlow stated:

- Unfortunately, I've come to a time where it makes the most sense for me to move on from Motivate due to some complicating personal reasons. Primarily: my fiance Alivia has not taken well to New York and it has put significant strain on our relationship.

- Additionally, my dad is getting up in the years and is reaching the point where I'd like to be close by on a very consistent basis - put simply: he's not even able to make it to restaurants anymore for family meals.

- Despite my almost immediate status as "New Yorker," it's time for me to head back to Chicago and focus on family.

- I spoke to John Reynolds about this in confidence this week as I've really struggled with this decision and he was quite supportive - even suggesting of a work-from-Chicago idea. Although I appreciate the thinking and considered it for a few days, I think I need some time off to move, fix my relationship, spend time with my dad, and recharge.

A copy of Inlow's August 13, 2015 email is attached hereto as Exhibit C.

17. Inlow's last day working for Motivate was on or around September 4, 2015, though he remained an employee until September 8, 2015 (the day after Labor Day). Inlow did not come into the office on his last day, and did not return either of the two laptop computers he had been issued by the Company.

D.   Inlow's Collaboration with PBSC Urban Solutions and Creation of Shift Transit

18. On or about October 9, 2015, Motivate became aware of a press release by PBSC and Shift Transit, stating that PBSC and Inlow had partnered to create Shift Transit, and that Inlow was serving as Shift Transit's CEO. According to the announcement, PBSC and Inlow plan to compete directly with Motivate in the bike share space, offering cities a "one-stop shop solution with turnkey delivery, offering bikes, stations, software, station siting and planning, marketing, sponsorship procurement and minute-to-minute system operations." A copy of the October 9, 2015 press release is attached hereto as Exhibit D. The press release came as a complete shock to Motivate's CEO and management team, who believed, based on Inlow's own statements, that he was leaving the bike share industry and moving to Chicago for personal reasons.

19. The press release, which was titled "PBSC Urban Solutions and Edward Inlow Join Forces to Launch Shift Transit, a New Bike-Share Operator," touted Inlow as a "key player in the North American bike-share industry for years," and characterized him as "one of the industry's most seasoned professionals in the planning, management, launch, operations and expansion of bike-share systems across North America." Exhibit D. As PBSC's CEO Luc Sabbatini stated:

> ***Edward knows this business inside-out, he knows where the improvement opportunities are and, most important, how to capture them***. This announcement is another milestone in our strategy to maintain and further grow our leadership position in the bike-sharing market.

Exhibit D (emphasis added).

20. Inlow conspired with PBSC to compete directly with Motivate through the formation of Shift Transit, using the confidential information and trade secrets Inlow gained from working at Motivate. In fact, though Inlow and PBSC have created a separate corporate entity called Shift Transit, it is apparent that Inlow is for all intents and purposes an employee of PBSC. Inlow's responsibilities at Shift Transit will be largely identical to those he had as COO/Vice President of Operations at Motivate.

21. Despite telling Motivate in August 2015 that his resignation was for personal reasons and that he wanted to take time off and get out of the bike share space, Inlow had already received an offer from PBSC in or around late July 2015. In fact, he had already negotiated the terms of his relationship with PBSC, including how much he would be paid by PBSC. At the time he negotiated these terms, he was an officer of Motivate.

22. On October 9, 2015, immediately after learning of the press release, Motivate, through counsel, wrote to Inlow and demanded that he cease all collaboration with PBSC immediately, and that he refrain from all other activities in his capacity at Shift Transit that could involve the use of Motivate's confidential information or trade secrets. A copy of that October 9, 2015 letter is attached hereto as Exhibit E. Counsel explained that, due to the nature of Inlow's positions with Motivate, his knowledge of Company trade secrets and confidential information was so wide-ranging that the possibility of disclosure in his new, analogous role at Shift Transit was high. The letter to Inlow also demanded that he immediately return the two laptop computers in his possession belonging to Motivate, and that he return any other documents or media containing Company information, including thumb drives or external hard drives. The letter explicitly stated that Inlow must not delete, scrub, or destroy anything on any of the devices. Exhibit E. This letter was sent to Inlow via email on Friday, October 9 and delivered by hand to his residence on Saturday, October 10, 2015.

23. Motivate also reiterated its concerns directly to PBSC in the days following the press release. Through counsel, on October 15, 2015 Motivate again explained the inevitable

conflict caused by the collaboration and Inlow's role at Shift Transit and with PBSC.  As counsel noted:

> We can envision no scenario under which Mr. Inlow can collaborate with PBSC (as described in the press release) without using, relying upon or drawing from the confidential information and trade secrets he possesses.

A copy of that October 15, 2015 letter is attached hereto as Exhibit F.  Counsel further clarified:

> We believe it is inevitable that Mr. Inlow will divulge the Company's trade secrets, and the harm to the Company should (and when) such a situation come to pass, would be irreparable.

Exhibit F.

E.  <u>PBSC's Business and Shift Transit</u>

24.  Until recently, PBSC focused on just the technological aspects of bike share programs, providing services such as software development, equipment manufacturing and delivery, system start-up, training, software-as-a-service for operations, and 24/7 technical support.  Motivate engaged PBSC as a vendor to provide these services for multiple of its systems, including Divvy in Chicago, Capital Bikeshare in Washington, D.C., and Citi Bike in New York City.

25.  Through its collaboration with Inlow and creation of Shift Transit, PSBC now seeks to expand beyond its limited technology support role to become a full-service operator in the bike share industry.  By creating a "one-stop shop solution" for bike sharing, and among other things providing services such as station siting and planning, marketing, operations and sponsorship procurement, PBSC seeks to become a direct competitor of Motivate in the bike share space.

26.  Upon information and belief, PBSC hired Inlow in order to use Motivate's confidential information and trade secrets Inlow possesses to its competitive advantage.  Upon information and belief, Inlow has already divulged confidential information to PBSC regarding Motivate's bike share operations, including information regarding its business practices and processes and its future strategic plans, as well as its financial models and forecasts, intellectual

property, strategic initiatives, human capital, contracts and pricing information, and customer lists.

27. Even without further direct disclosure of Motivate's confidential information and trade secrets, Inlow, functioning as CEO of Shift Transit in a position with responsibilities largely identical to his responsibilities at Motivate, will necessarily be helping PBSC (through his relationship with Shift Transit) to make its own business choices in the bike share market, armed with full knowledge of Motivate's confidential information, trade secrets, plans, models, and analyses that he learned and developed for Motivate while serving as one of Motivate's top officers.

28. Given these facts, there is a substantial threat that Inlow will continue to divulge or use Motivate's confidential information and trade secrets in his new role, all in violation of his legal obligations to Motivate. If this occurs, or has occurred, Motivate will be at a significant disadvantage in the bike share market. Motivate has a legitimate business interest in protecting its confidential information and trade secrets, the results of its research and development, its competitive standing in the marketplace, and its goodwill.

29. Unless the conduct set forth above is restrained by this Court, Motivate will suffer substantial and irreparable injury.

F. <u>Inlow's Theft of Confidential Information and Trade Secrets Belonging to Motivate</u>

30. In its October 9, 2015 letter from counsel, Motivate notified Inlow that he must return all Company property, and that he must take no action to delete, scrub, or destroy anything on any Company devices:

> You must also return all Company property and any documents or media containing the Company's confidential information. This includes thumb drives, ***external hard drives***, and other portable storage devices (personal or Company-issued) you may have used to store Company information (and likewise ***you must take no action to delete, scrub or destroy anything on any of these devices, to the extent they exist***). Please be aware that this request that you not delete information includes Company information contained in personal email accounts. ***If it is determined that you have deleted or otherwise taken action to destroy relevant evidence, we will seek sanctions and any other remedies provided for by law.***

Exhibit E (emphasis added).

31. Immediately upon return of the laptop computers Inlow used while employed by Motivate, Motivate engaged a forensics company to analyze those machines. The results showed that Inlow attached an external hard drive to both laptops and indicated that that hard drive had been attached as late as August, 2015, after Inlow knew he would be leaving Motivate. Though the files on the external drive could not be viewed, file names such as "Newco Term Sheet Proposal 080215.xlsx" "2014 budget cuts" and "Board Financial Slides 2015.08.06" could be seen as having been accessed and possibly transferred in August 2015 (again, after Inlow had decided to leave Motivate). It also appeared that Inlow mass deleted company files he had put in his personal google drive on September 25, 2015, again, after he left Motivate.

32. The actual "Newco Term Sheet Proposal 080215.xlsx" file was recovered from a temporary file on one of Inlow's work laptops. As demonstrated in the file name itself, the document was dated August 2, 2015, confirming that Inlow was negotiating his new employment with PBSC in late July and early August 2015. This file included, among other things, funding requirements for Inlow's new company (Shift Transit), initial equity outlay, Inlow's salary requirements to be paid to Inlow by PBSC, and additional terms such as: "NEWCO to receive 5% royalty on any PBSC sale directly due to NEWCO sales process."

33. Upon learning that there was an external hard drive that Inlow had not disclosed (even after being notified of his obligations in the letter from Motivate's counsel), counsel for Motivate immediately demanded that the external hard drive be returned for forensics review. Due to privilege concerns and because the external hard drive might contain personal information, counsel for Inlow and counsel for Motivate negotiated a forensics agreement so that privileged and personal information would be protected. Inlow then provided the hard drive to counsel for Motivate, despite having not divulged its existence until the forensics review of the laptops demonstrated that it existed.

34. Instead of divulging that he had the external drive, Inlow attempted to hide its existence. He clearly knew that he had the external hard drive at the time he returned the laptop

computers, because just days before on October 10, 2015, he had mass deleted Company documents from the external hard drive. He deleted the documents from the external drive the very morning after he received Motivate's letter, despite the clear instructions in the letter stating that he must take no action to delete, scrub, or destroy files. Forensic analysis shows this mass deletion of materials from the external hard drive occurred between 9:35 and 9:45 a.m. October 10, 2015. The files are in the process of being recovered by the vendor who is conducting the forensic analysis.

35. Though the forensics analysis is not completed, initial analysis of the external hard drive demonstrates that Inlow copied hundreds of documents belonging to Motivate onto the external drive in late July and early August, after he knew he would be leaving Motivate and joining forces with PBSC. Specifically, much of the copying appears to have occurred on July 30 and August 2, 2015.

36. Due to the forensics protocol, which requires permission from counsel for Inlow prior to review of files on the external hard drive (the files Inlow tried to delete to hide evidence of his theft), and due to the sheer volume or files Inlow took, Motivate has not yet viewed all of the files that Inlow copied to the external hard drive. However, based on a review of the file names and a familiarity with its documents, it is clear that Inlow's theft was wide ranging and included documents and files containing Motivate's confidential information and trade secrets, including files pertaining to operations budgets and models, financials, board updates and presentations, budget reports, COO weekly reports, user revenues, project plans and proposals, plans for expansion, staffing plans, employment agreements, operating contracts, supply agreements, sponsorship agreements, various bike share contracts, an agreement with the Chicago Department of Transportation, software licenses and intellectual property, and leases.

37. The list of files Inlow copied onto his external hard drive has been provided to counsel for Inlow and PBSC. As just a few examples of hundreds, documents included in this list and copied by Inlow on July 30 and August 2, 2015 are believed to be:

- Multiple monthly and full-year financial reporting documents and client submissions for each of the bike systems Motivate operates, including financial reporting for individual months and 2015 year-to-date information and information related to revenue and exposure, forecasts and anticipated costs;

- Proprietary mapframe renderings provided by a vendor;

- Documents containing technical information and processes related to proprietary helmet distribution solutions in Seattle;

- Multiple policy documents related to proprietary internal practices, including project communication, crash reporting, project calendars, and finance practices;

- Performance metrics for the Chicago program;

- Research and analysis for RFP responses in Boston, Philadelphia, Northern New Jersey, Milwaukee, Vancouver, Pittsburgh, Cuenca, Hamilton, Santa Monica, Los Angeles, Toronto, Seattle, Providence, Baltimore, Singapore, Madrid, and Portland, which included financial projections, operational strategies, revenue, overhead and other cost projections; and

- Job descriptions highlighting position responsibilities for various key roles at Motivate, employment agreements for individuals who reported directly to Inlow, including pay information of members of the Company's executive committee and key managers in key locations.

38. In short, Inlow took everything he might need to set up his own competing company and help PBSC expand its operations to compete with Motivate.

39. Upon information and belief, Inlow's download of documents belonging to Motivate continued in the weeks following, though not on the mass scale as the copying done on July 30 and August 2, 2015.

40. Even when presented with this evidence, PBSC has refused to terminate its relationship with Inlow.

## COUNT I – VIOLATION OF THE ILLINOIS TRADE SECRETS ACT
**(Against all Defendants)**

41. Plaintiff re-alleges and incorporates herein the allegations contained in all of the above paragraphs.

42. In the course of his engagement with Motivate, Inlow learned confidential and proprietary information that constitutes trade secrets of the Company, as defined in the Illinois Trade Secrets Act, ILCS 1065/1, *et seq*. Inlow learned about, and had extensive and intimate knowledge regarding, among other things, Motivate's confidential information and trade secrets pertaining to the Company's business practices and processes and its future strategic plans, as well as its financial models and forecasts, intellectual property, strategic initiatives, human capital, contracts and pricing information, and customer lists.

43. Such information derives economic value from not being generally known to other persons who can obtain economic value from its disclosure and use. Motivate takes reasonable measures to maintain the secrecy or confidentiality of such information.

44. Inlow violated the Illinois Trade Secrets Act by willfully and intentionally misappropriating and upon information and belief, disclosing Motivate trade secrets, which he acquired under circumstances giving rise to a duty to maintain their secrecy.

45. Upon information and belief, PBSC knew or had reason to know that Inlow was under a legal duty not to disclose Motivate's trade secrets, and that it acquired Motivate's trade secrets by improper means. Upon information and belief, PBSC violated the Illinois Trade Secrets Act by willfully and intentionally misappropriating, acquiring, and using Motivate trade secrets.

46. In addition to his blatant theft of documents containing Motivate's confidential information and trade secrets, and in the alternative, even if Inlow had not stolen such information, due to his position as COO/Vice President of Operations, it is inevitable that Defendants will rely on Motivate's trade secrets to Motivate's detriment. As CEO of Shift Transit, Inlow has responsibilities largely identical to his responsibilities at Motivate. He is in a role that is intended to directly compete with Motivate, and thus cannot help but rely on Motivate's trade secrets in working with PBSC and Shift Transit. These secrets will enable PBSC and Shift Transit to achieve a substantial advantage by knowing exactly how, among other things, Motivate will price and market its services.

47. Upon information and belief, Defendants' disclosure, acquisition, use, and misappropriation of Motivate's trade secrets was willful, malicious, and without legal justification. Upon information and belief, Defendants misappropriated, acquired, disclosed, and used Motivate's confidential information without its permission or consent.

48. As a result of these actions, Motivate has been and will be irreparably harmed and has sustained and will sustain irreparable and substantial damages.

## COUNT II – CONVERSION
### (Against Inlow)

49. Motivate re-alleges and incorporates herein the allegations contained in all of the above paragraphs.

50. As set forth above, in violation of his obligations to Motivate reaffirmed through the Employee Handbook and offer letter, in the days preceding his resignation Inlow took Motivate's confidential information and other property by mass downloading them onto an external hard drive, including files pertaining to operations budgets and models, financials, board updates and presentations, project plans and proposals, plans for expansion, operating contracts, supply agreements, sponsorship agreements, various bike share contracts, COO weekly reports, software licenses and intellectual property, and leases.

51. Motivate has an absolute and unconditional right to the immediate possession of its confidential information and other property. Upon information and belief, Inlow has already used the information contained in the documents he stole from Motivate to unjustly gain competitive advantage for Shift Transit and PBSC.

52. On October 9, 2015, counsel for Motivate wrote to Inlow and demanded possession of all Company property and any documents or media containing its confidential information. Exhibit E.

53. Upon information and belief, Inlow has other copies of such documents in his possession, including on his personal computer. Inlow has willfully and maliciously converted such property.

54. Motivate is entitled to an order directing Inlow to immediately return all property (and all copies thereof) belonging to Motivate.

55. As a direct and proximate result of Inlow's conversion of Motivate's property, Motivate has been and will be irreparably harmed and has sustained and will sustain irreparable and substantial damages.

**COUNT III – BREACH OF FIDUCIARY DUTY**
**(Against Inlow)**

56. Motivate re-alleges and incorporates herein the allegations contained in all of the above paragraphs.

57. Inlow had a fiduciary duty of loyalty not to act in a manner adverse to Motivate's interests while he was an officer and employee of Motivate.

58. Inlow willfully and maliciously breached his duty of loyalty to Motivate by seeking out and removing documents containing confidential and proprietary information and trade secrets from Motivate, with, upon information and belief, the purpose of using such documents in his collaboration with PBSC to form and run Shift Transit.

59. In approximately late July and early August 2015, up until shortly before he announced his resignation, Inlow downloaded hundreds of files to an external hard drive. These files contained highly confidential and proprietary information, and trade secrets belonging to Motivate. The files pertained to, among other things, operations budgets and models, financials, board updates and presentations, budget reports, COO weekly reports, user revenues, project plans and proposals, plans for expansion, staffing plans, employment agreements operating contracts, supply agreements, sponsorship agreements, various bike share contracts, an agreement with the Chicago Department of Transportation, software licenses and intellectual property, and leases. After receiving a letter from Motivate's counsel explicitly instructing Inlow to return Motivate's property, and that he must take no action to delete, scrub, or destroy anything on any Company devices, Inlow mass deleted all of these files from his desktop in an attempt to hide his actions.

60. As a direct and proximate result of Inlow's breach of his fiduciary duty of loyalty to Motivate, Motivate has been and will be irreparably harmed and has sustained and will sustain substantial damages.

## JURY DEMAND

61. Plaintiff requests a trial by jury on all issues and claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor against all Defendants, individually, jointly, and severally, asking as follows:

(a) That this Honorable Court enter a decree preliminarily and permanently enjoining Defendants from using, disclosing, and misappropriating (including both actual and threatened misappropriation) Motivate's trade secrets and/or confidential and proprietary information, including enjoining Inlow from performing services for PBSC in any capacity.

(b) That this Honorable Court enter a decree requiring Inlow to return to Motivate all confidential and/or trade secret information, including all Motivate documents (electronic or otherwise) in his possession.

(c) That this Honorable Court enter a decree requiring Defendants to preserve, and not destroy, any and all electronically stored information, including that stored on PBSC networks, or any of Defendants' business or home computers, relating in any way to Motivate's confidential and/or trade secret information, Inlow's relationship with Motivate and the cessation of that relationship, the collaboration regarding and creation of Shift Transit, and Inlow's employment with Shift Transit.

(d) That this Honorable Court enter a decree requiring Inlow to provide his personal computer(s) and electronic mail account(s), and any other removable drives or devices in his possession for immediate forensic analysis, and requiring PBSC to allow inspection and forensic analysis of its networks and related systems.

(e) That this Honorable Court issue an award for all damages suffered by Motivate against Inlow and PBSC for their misappropriation of Motivate's trade secrets, including actual damages and the unjust enrichment caused by Defendants' misappropriation.

(f) That this Honorable Court enter an award of actual and punitive damages suffered by Motivate against Inlow as result of his breach of fiduciary duty and conversion of Motivate's property.

(g) That this Honorable Court issue an award of reasonable attorneys' fees and costs, including costs incurred for all forensic review necessitated by Defendants' actions.

(h) That this Honorable Court enter an award for any other relief the Court deems just and appropriate.

Dated: November 4, 2015

Respectfully submitted,

*s/ Mark D. Pollack*
Mark D. Pollack
Emily L. Seymore
PAUL HASTINGS LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: markpollack@paulhastings.com
Email: emilyseymore@paulhastings.com

Robert M. Masters, *pro hac vice motion forthcoming*
Carson H. Sullivan, *pro hac vice motion forthcoming*
PAUL HASTINGS LLP
875 15th Street, NW
Washington, D.C. 20005
Telephone: (202) 551-1700
Facsimile: (202) 551-1705
Email: robmasters@paulhastings.com
Email: carsonsullivan@paulhastings.com

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MOTIVATE INTERNATIONAL, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EDWARD INLOW and PBSC URBAN ) <br> SOLUTIONS INC., ) <br> ) <br> Defendants. ) | CIVIL ACTION NO. _____ |

## VERIFICATION

I, John Reynolds, having personal knowledge of the facts stated herein, and being of legal age and sound mind and memory, do hereby declare and verify as follows:

1.  I am the Vice President of Human Resources for Plaintiff Motivate International, Inc.

2.  I have read the Verified Complaint above, and am familiar with its contents. I declare under penalty of perjury under the laws of the United States that all of the facts contained in the foregoing Verified Complaint are true and correct to the best of my knowledge or information and belief.

Dated: November 3, 2015

Motivate International, Inc.

_[signature]_

By: John Reynolds